BEN HUB COAL COMPANY, a corporation, Appellant,

v.

Earl WELLS and M. A. Berman, co-partners doing business as Starr Coal Company, Appellees.

No. 5413.

United States Court of Appeals Tenth Circuit.

Feb. 13, 1957.

G. C. Spillers, Jr., Tulsa, Okl. (G. C. Spillers, Tulsa, Okl., on the brief), for appellant.

Richard B. McDermott, Tulsa, Okl. (Bradford J. Williams, Fenelon Boesche, T. Hillas Eskridge and Franklin D. Hettinger, Tulsa, Okl., on the brief), for appellees.

Before BRATTON, Chief Judge, and MURRAH and LEWIS, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a judgment denying recovery of triple damages under Section 15, Title 15 U.S.C.A., for losses incurred by the appellant in competition with appellees' coal sales. Such sales are said to have been made at "unreasonably low" prices "for the purpose of destroying competition, or eliminating a competitor" within the meaning of the latter part of Section 3 of the Robinson-Patman Act, § 13a, Title 15 U.S.C.A.

The appellant, a family corporation owned by Ellis, Gene and Amy Taylor, and the appellees have been competing producers of domestic coal in Henryetta, Oklahoma, for a great number of years. Although there have been various price levels in the preceding years, Henryetta domestic stoker coal was selling for $7.35 per ton on November 1, 1953, at which time the appellees reduced their price to all customers to $6.50 per ton f. o. b. Henryetta, and subsequently on June 1, 1954, to $6 per ton. To maintain its competitive market, the appellant also reduced its prices, but excessive losses compelled it to increase its price in the latter part of 1954 over that of the appellees. Such reductions, says the appellant, were the culmination of a growing animosity between the parties and were made solely for the purpose of destroying the appellant as a competitor.

Upon a trial of the case to the court without a jury, the court found that in making the two price reductions, the defendants were motivated by business considerations, including shrinkage of the competitive market; decline in the prices of immediate competitors; pressure of

their wholesale customers; appellant's covert discounts below its published price; desire to maintain existing volume, recover and retain individual customers, and maintain and increase their profit. The court specifically found that the price reductions complained of were not motivated by malice or by an intent to injure or destroy competition or the appellant; that the accused prices of the appellees were not low in relation to competitive prices for like products but were always higher than comparable coal from competing mines. It was on these findings that the trial court dismissed the cause of action and entered judgment for the appellees.

There is no question of federal jurisdiction founded in the antitrust law. The sole and only question is whether the findings of the court are without support in the record, hence clearly erroneous. Appellant earnestly contends that they are utterly without factual foundation.

■ It may be noteworthy to observe at the outset that we do not have the problem of price discrimination to competing buyers under Section 2(b) of the Robinson-Patman Act, § 13(b), Title 15 U.S.C.A. as in Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239; or discriminatory sales for the purpose of eliminating competition under Section 3 as in Mead's Fine Bread Co. v. Moore, 10 Cir., 208 F.2d 777, reversed 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145, rehearing denied 348 U.S. 932, 75 S.Ct. 334, 99 L.Ed. 731. And so, we have no occasion to indulge in the contrariety of views concerning whether good faith reduction to meet an equally low price of a competitor must be uniform. See "Report of the Attorney General's National Committee to Study the Antitrust Laws", March 31, 1955, pp. 179–186; "Report of the Select Committee on Small Business", H. R. 2966, 84th Cong., 2d Sess., pp. 256–277. We have here only the question of whether uniform price reductions violated the unreasonably low price provisions of Section 3 of the Robinson-Patman Act. And, to recover under this provision of Section 3, prices must not only be unreasonably low, but they must also have been established with the design and purpose to destroy competition. Balian Ice Cream Co. v. Arden Farms Co., D.C., 104 F.Supp. 796, 800, affirmed, 9 Cir., 231 F.2d 356, certiorari denied 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856, rehearing denied 351 U.S. 928, 76 S.Ct. 778, 100 L.Ed. 1458; F. & A. Ice Cream Co. v. Arden Farms Co., D. C., 98 F.Supp. 180.

The basic facts are that Henryetta domestic stoker coal, with an established reputation for premium quality, is sold through wholesalers f. o. b. Henryetta to consumer markets in Kansas, Missouri, Nebraska, Iowa, South Dakota and Minnesota in competition with coal of comparable grade and quality from Catoosa, Oklahoma, Southern Illinois and Western Kentucky. It seems agreed, however, that the Henryetta coal has always enjoyed a premium price over other coals by reason of consumer preference.

There was an abundance of evidence on behalf of the appellant to the effect that the reduction in price of Henryetta coal on November 1 was "unusual" due to the fact that coal dealers had already contracted for their supply at the higher price, and that the reduction at or just before the peak of the season prompted some of the dealers to demand a price revision. There was also credible testimony to the effect that the reduction of the price of the coal did not stimulate sales, and that there would have been as much Henryetta coal sold at $7.35 per ton as $6.50, or even $6; and that in fact the reduced prices were not passed on to the consumer but were pocketed by the retailers. Indeed, there was testimony to the effect that the Henryetta operators could not profitably produce coal at $6.50 per ton and that the price reductions complained of eliminated one competitor and ruined the appellant; that the appellees lost money and were able to survive only with the support of large profitable sales of industrial coal. Specifically there was accounting evidence from which the appellant persuasively argues that according to the appellees' own

methods of accounting, they realized 71¢ average profit per ton on $7.35 domestic coal in the fiscal year ending September 30, 1953, and only 11¢ per ton on comparable tonnage for the fiscal year ending September 30, 1954, including approximately $9,000 profit made in October 1953 before the November 1st price reduction. The appellees raised the price of their coal from $6 to $6.50 on January 1, 1955. And, appellant introduced testimony to the effect that during the latter part of 1954 and most of 1955, the appellees were engaged in what they called "retreating operations" during which they avoided expensive development work, thereby enabling them to show a fanciful profit.

These facts are portrayed against a hostile background commencing in 1949 when appellant broke a stalemate in a strike between the Coal Operators Association and the Miners Union by signing a contract with the Union against the advice of appellee, Wells, who was representing the Association in the labor dispute. Another event alluded to as indicative of animosity was the option secured by the appellant to lease 120 acres of valuable coal land upon the expiration of appellees' lease. When the lease was inadvertently allowed to expire without renewal, it was taken by the appellant, leaving appellees almost without additional productive coal land. Another straw in the wind were statements by Wells to the effect that if Manager Ellis Taylor did not cease cutting his price and splitting commissions with his jobbers, he could cut his price. And, finally came the conference between Gene Taylor and Wells, after the price reductions, when Taylor prevailed upon Wells to restore the price in order to spare appellant's business. Wells is said to have replied that he was sorry for Gene and his mother but he "was forced to teach him [Ellis Taylor] a lesson."

The appellees developed their case against a background of a constantly diminishing demand for both consumer and industrial coal due to the encroaching natural gas and fuel oil supplies. It was shown that in the ten years preceding the trial of the case, the national domestic market for coal declined over 51 percent, and that in the last five years, Oklahoma domestic coal tonnage dropped 84 percent; that during the same period, the number of producing coal mines in Oklahoma decreased from 95 to 61; that in 1920 there were 36 producing underground Henryetta coal mines, and at the date of the trial, there were only 2—the appellant and appellees. It was in this context of over-pricing, in a dwindling and competitive market, that the appellees say they reduced their prices of domestic coal in order to increase their volume and decrease the unit cost.

The basic and material difference in the loss on oil-treated domestic coal sales shown by appellant's audit of appellees' accounting records and the profit shown by appellees' audit lies in the accounting methods employed to arrive at divergent results.

In determining appellees' profit or loss on oil-treated domestic stoker coal the appellant first assumed that the two competing mining operations were sufficiently similar for cost accounting purposes. Using its own operation as a criterion, it proceeded to determine the cost of producing oil-treated domestic stoker coal separate and apart from any other line. It charged against this line additional labor, machine and oiling expenses and also the constant loss on slack or fine coal.

In computing their profit or loss, the appellees employed the accounting methods and practices used in the regular course of their business, said to be customary in the coal producing industry. Under this method of accounting all production costs, fixed and variable, are lumped against the total sales to determine unit cost of production. And, profit or loss on different grades and qualities is determined by the difference between the unit cost of production and the respective sales prices. The only exception recognized by the appellees is to take the costs of oil treating and advertising out of the general cost of production and

charge it directly to oil-treated stoker coal. Appellees concede the additional labor and machinery costs in the production of oil-treated domestic coal but take the position that the amount is negligible and indeterminable.

Employing this method of accounting, and based on their own accounting records, the appellees produced a profit and loss statement for the fiscal year ending September 30, 1954, showing a net profit of approximately $153,000 on total coal sales of approximately 231,000 tons, or approximately 66¢ per ton. During this period industrial coal sold for $5.95 per ton and oil-treated domestic coal sold at $7.35, $6.50 and $6. Breaking it down into categories of industrial coal and the various grades of domestic coal, the statement showed a net profit of $1.05 per ton on industrial coal; 79¢ per ton on 57,000 tons of oil-treated domestic coal; and a profit of 11¢ per ton on a total of 95,000 tons of all grades of domestic coal, including a $2 loss per ton on the slack or fine coal—always sold at a loss.

Using the same method of cost accounting, but relating it to the different pricing periods under consideration, it was shown that for the seven months ending May 31, 1954, while oil-treated domestic coal was selling for $6.50 per ton, appellees realized a net profit of 74¢ per ton on total sales of 131,000 tons; a profit of 94¢ per ton on 32,000 tons of oil-treated domestic coal; and total domestic profit of 23¢ per ton on 54,000 tons. For the seven months ending December 31, 1954, during which oil-treated domestic coal sold for $6 per ton, the appellees realized a net profit of 68¢ per ton on a total of 58,000 tons; 66¢ per ton on 48,000 tons of oil-treated domestic coal; and 6¢ per ton on a total of 77,000 tons of all grades of domestic coal. For the four months ending April 30, 1955, during which oil-treated domestic coal sold for $6.50 per ton, appellees realized a net profit of $1.27 per ton on a total of 85,000 tons; $1.44 per ton on 22,000 tons of oil-treated domestic coal; and

73¢ per ton on a total of 36,000 tons of all grades of domestic coal. The statement showed an increased profit on $6 oil-treated domestic coal over the $6.50 coal in the face of a diminished per ton profit realization (94¢ to 66¢) because of a volumetric decrease in unit cost. To reflect the increase in sales of $6 domestic coal over their sales at higher prices, the appellees produced a comparison of the $6 coal sales period with identical months in the previous year. The result showed a total increase of 20 percent of all domestic coal and a 25 percent increase in the oil-treated stoker.

To show the "how and why" for the increased profits based upon the volumetric decrease in unit cost, the appellees produced graphic illustrations of the ratio of unit cost to selling price as related to volume of production. Taking its fixed market of industrial coal of 132,000 tons per fiscal year at a fixed selling price of $5.95, it was shown that it was necessary to produce only 6000 tons of domestic coal at $5.50 net, or a total of 138,000 tons of coal at established selling prices, in order to reach the "break-even point". From that point appellees plotted the curves of unit cost and average selling price in relation to tonnage production to a point where their fiscal 1954 total output of 231,000 tons cost $4.90 per ton, which when sold at an average selling price of $5.40 per ton yielded a net profit of approximately 50¢ per ton. Basically, this cost analysis was based upon actual selling prices, production costs and tonnage, and is in conformity with their accounting records. The discrepancy, however, between this reflected profit and the 66¢ per ton reflected in the audit is explained by an understatement of the industrial production tonnage and an overstatement of some operational costs. In other words, the graph was on the "conservative side". In any event, the appellees accounting records show an overall profit which the appellant cannot gainsay. And, there was testimony to the effect that if this production and pricing pat-

tern were applicable to the appellant's operation, it would result in a profitable enterprise.

The appellant, however, challenges this method of cost accounting as a wholly unrealistic and unreasonable method of determining whether the appellees sold domestic coal at unreasonably low prices. In effect it says that profit and loss must be determined by the unit cost of domestic coal standing alone; that acceptance of the method of accounting employed by the appellees would allow them to use the profits from industrial coal sales as a war chest to destroy competition and to eliminate the appellant as a competitor by selling his domestic coal at a loss.

■ We do not suppose that the appellees could use their profits from one line to sustain their business while selling another line at a loss to eliminate a competitor with any less impunity than they could discriminate with respect to prices of merchandise of the same grade and quality to different customers for the same purpose. Cf. Mead's Fine Bread Co. v. Moore, supra. Furthermore, it would ignore the economic facts of life to say that one in business for a profit would deliberately and consistently sell at a loss without some ulterior motive. It would be equally inadmissible to say that one who consistently sells at a loss without competitive compulsion is not selling at unreasonably low prices. And, one who consistently sells at unreasonably low prices is vulnerable to the inference that he is doing so for the proscribed purpose of destroying competition or eliminating a competitor.

■ We cannot say, however, that a pricing policy based upon sound economics is inadmissible simply because it may result in the destruction of a competitor, for it is not within the scope or purpose of the antitrust laws to protect a business against loss in a competitive market. Balian Ice Cream Co. v. Arden Farms, supra, at p. 801. One who reduces his prices in defense of his economic life cannot be guilty of eliminating competition or his competitors. If, as the trial court held, the price reductions on domestic coal were made to increase volume and decrease unit cost in order to retain its proportionate share of a diminishing market, the appellees were certainly within the law. In the final analysis, the question resolves itself into one of intent and purpose, not a choice of accounting methods. The trial court has absolved the appellees of any guilty intent and we cannot say that its findings and conclusions in that respect are clearly erroneous. The judgment is affirmed.