# UTAH PIE CO. *v.* CONTINENTAL BAKING CO. ET AL.

No. 18.   Argued January 17, 1967.—Decided April 24, 1967.

*Joseph L. Alioto* argued the cause and filed briefs for petitioner.

*John H. Schafer* argued the cause and filed a brief for Continental Baking Co., *Peter W. Billings* argued

the cause and filed a brief for Carnation Co., and *George P. Lamb* argued the cause and filed a brief for Pet Milk Co., respondents.

MR. JUSTICE WHITE delivered the opinion of the Court.

This suit for treble damages and injunction under §§ 4 and 16 of the Clayton Act, 38 Stat. 731, 737, 15 U. S. C. §§ 15 and 26[1] was brought by petitioner, Utah Pie Company, against respondents, Continental Baking Company, Carnation Company and Pet Milk Company. The complaint charged a conspiracy under §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1 and 2, and violations by each respondent of § 2 (a) of the Clayton Act as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (a).[2] The jury found for respondents on the conspiracy charge and

---

[1] 15 U. S. C. § 15 provides that:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

15 U. S. C. § 26 provides injunctive relief for private parties from violation of the antitrust laws.

[2] The portion of § 2 (a) relevant to the issue before the Court provides:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ."

for petitioner on the price discrimination charge.[3]   Judgment was entered for petitioner for damages and attorneys' fees and respondents appealed on several grounds. The Court of Appeals reversed, addressing itself to the single issue of whether the evidence against each of the respondents was sufficient to support a finding of probable injury to competition within the meaning of § 2 (a) and holding that it was not.   349 F. 2d 122.   We granted certiorari.   382 U. S. 914.[4]   We reverse.

---

[3] Respondent Continental by counterclaim charged petitioner with violation of § 2 (a) in respect to certain sales. On this issue the jury found for Continental, and although petitioner failed to move for a directed verdict on the counterclaim before its submission to the jury, the trial judge granted petitioner's motion for judgment notwithstanding the verdict. The Court of Appeals reversed the judgment notwithstanding the verdict on the counterclaim, and remanded the issue for a new trial. No question concerning the counterclaim is before the Court.

[4] The order allowing certiorari requested counsel to brief and discuss at oral argument, in addition to the questions presented by the petition, the following questions:

"1. Whether, if this Court affirms the judgment and order of the Court of Appeals directing the District Court to enter judgment for respondents, petitioner can then make a motion for new trial under Rule 50 (c) (2) of the Federal Rules of Civil Procedure within 10 days of the District Court's entry of judgment for respondents?"

"2. Whether, if under the order of the Court of Appeals, petitioner cannot make a motion for new trial under Rule 50 (c) (2) within 10 days of the District Court's entry of judgment against him, the order of the Court of Appeals directing the District Court to enter judgment for respondents is compatible with Rule 50 (b) as interpreted by this Court in Cone v. West Virginia Pulp & Paper Co., 330 U. S. 212; Globe Liquor Co. v. San Roman, 332 U. S. 571; and Weade v. Dichmann, Wright & Pugh, 337 U. S. 801?

"3. Whether Rule 50 (d) of the Federal Rules of Civil Procedure provides the Court of Appeals with any authority to direct the entry of judgment for respondents?"

In the light of our disposition of this case, we need not reach these questions.

The product involved is frozen dessert pies—apple, cherry, boysenberry, peach, pumpkin, and mince. The period covered by the suit comprised the years 1958, 1959, and 1960 and the first eight months of 1961. Petitioner is a Utah corporation which for 30 years has been baking pies in its plant in Salt Lake City and selling them in Utah and surrounding States. It entered the frozen pie business in late 1957. It was immediately successful with its new line and built a new plant in Salt Lake City in 1958. The frozen pie market was a rapidly expanding one: 57,060 dozen frozen pies were sold in the Salt Lake City market in 1958, 111,729 dozen in 1959, 184,569 dozen in 1960, and 266,908 dozen in 1961. Utah Pie's share of this market in those years was 66.5%, 34.3%, 45.5%, and 45.3% respectively, its sales volume steadily increasing over the four years. Its financial position also improved. Petitioner is not, however, a large company. At the time of the trial, petitioner operated with only 18 employees, nine of whom were members of the Rigby family, which controlled the business. Its net worth increased from $31,651.98 on October 31, 1957, to $68,802.13 on October 31, 1961. Total sales were $238,000 in the year ended October 31, 1957, $353,000 in 1958, $430,000 in 1959, $504,000 in 1960 and $589,000 in 1961. Its net income or loss for these same years was a loss of $6,461 in 1957, and net income in the remaining years of $7,090, $11,897, $7,636, and $9,216.

Each of the respondents is a large company and each of them is a major factor in the frozen pie market in one or more regions of the country. Each entered the Salt Lake City frozen pie market before petitioner began freezing dessert pies. None of them had a plant in Utah. By the end of the period involved in this suit Pet had plants in Michigan, Pennsylvania, and California; Continental in Virginia, Iowa, and California; and Carnation in California. The Salt Lake City market was supplied

by respondents chiefly from their California operations. They sold primarily on a delivered price basis.

The "Utah" label was petitioner's proprietary brand. Beginning in 1960, it also sold pies of like grade and quality under the controlled label "Frost 'N' Flame" to Associated Grocers and in 1961 it began selling to American Food Stores under the "Mayfresh" label.[5] It also, on a seasonal basis, sold pumpkin and mince frozen pies to Safeway under Safeway's own "Bel-air" label.

The major competitive weapon in the Utah market was price. The location of petitioner's plant gave it natural advantages in the Salt Lake City marketing area and it entered the market at a price below the then going prices for respondents' comparable pies. For most of the period involved here its prices were the lowest in the Salt Lake City market. It was, however, challenged by each of the respondents at one time or another and for varying periods. There was ample evidence to show that each of the respondents contributed to what proved to be a deteriorating price structure over the period covered by this suit, and each of the respondents in the course of the ongoing price competition sold frozen pies in the Salt Lake market at prices lower than it sold pies of like grade and quality in other markets considerably closer to its plants. Utah Pie, which entered the market at a price of $4.15 per dozen at the beginning of the relevant period, was selling "Utah" and "Frost 'N' Flame" pies for $2.75 per dozen when the instant suit was filed some 44 months later.[6] Pet, which was offering pies at $4.92 per dozen in February 1958, was offering

---

[5] Beginning in February 1960 petitioner sold frozen pies to a Spokane, Washington, buyer under the "Sonny Boy" label.

[6] The prices discussed herein refer to those charged for apple pies. The apple flavor has been used as the standard throughout this case, without objection from the parties, and we adhere to the practice here.

"Pet-Ritz" and "Bel-air" pies at $3.56 and $3.46 per dozen respectively in March and April 1961. Carnation's price in early 1958 was $4.82 per dozen but it was selling at $3.46 per dozen at the conclusion of the period, meanwhile having been down as low as $3.30 per dozen. The price range experienced by Continental during the period covered by this suit ran from a 1958 high of over $5 per dozen to a 1961 low of $2.85 per dozen.[7]

---

[7] The Salt Lake City sales volumes and market shares of the parties to this suit as well as of other sellers during the period at issue were as follows:

### 1958

| Company | Volume (in doz.) | Percent of Market |
| --- | --- | --- |
| Carnation | 5,863 | 10.3 |
| Continental | 754 | 1.3 |
| Utah Pie | 37,969.5 | 66.5 |
| Pet | 9,336.5 | 16.4 |
| Others | 3,137 | 5.5 |
| Total | 57,060 | 100.0 |

### 1959

| Carnation | 9,625 | 8.6 |
| --- | --- | --- |
| Continental | 3,182 | 2.9 |
| Utah Pie | 38,372 | 34.3 |
| Pet | 39,639 | 35.5 |
| Others | 20,911 | 18.7 |
| Total | 111,729 | 100.0 |

### 1960

| Carnation | 22,371.5 | 12.1 |
| --- | --- | --- |
| Continental | 3,350 | 1.8 |
| Utah Pie | 83,894 | 45.5 |
| Pet | 51,480 | 27.9 |
| Others | 23,473.5 | 12.7 |
| Total | 184,569 | 100.0 |

## I.

We deal first with petitioner's case against the Pet Milk Company. Pet entered the frozen pie business in 1955, acquired plants in Pennsylvania and California and undertook a large advertising campaign to market its "Pet-Ritz" brand of frozen pies. Pet's initial emphasis was on quality, but in the face of competition from regional and local companies and in an expanding market where price proved to be a crucial factor, Pet was forced to take steps to reduce the price of its pies to the ultimate consumer. These developments had consequences in the Salt Lake City market which are the substance of petitioner's case against Pet.

First, Pet successfully concluded an arrangement with Safeway, which is one of the three largest customers for frozen pies in the Salt Lake market, whereby it would sell frozen pies to Safeway under the latter's own "Bel-air" label at a price significantly lower than it was selling its comparable "Pet-Ritz" brand in the same Salt Lake market and elsewhere.[8] The initial price on "Bel-air"

*1961*

| Company | Volume (in doz.) | Percent of Market |
|---|---|---|
| Carnation | 20,067 | 8.8 |
| Continental | 18,799.5 | 8.3 |
| Utah Pie | 102,690 | 45.3 |
| Pet | 66,786 | 29.4 |
| Others | 18,565.5 | 8.2 |
| Total | 226,908 | 100.0 |

[8] The Pet-Safeway contract, entered into on January 1, 1960, obligated the Safeway organization to purchase a minimum of 1,000,000 cases (six pies per case) from Pet during the year. The contract was orally renewed for one year and thereafter to the time of the trial the production of "Bel-air" pies by Pet for Safeway was continued without a formal contract. All of the volume of the Safeway purchases under the contract of course did not find its way to the Salt Lake City market.

pies was slightly lower than Utah's price for its "Utah" brand of pies at the time, and near the end of the period the "Bel-air" price was comparable to the "Utah" price but higher than Utah's "Frost 'N' Flame" brand. Pet's Safeway business amounted to 22.8%, 12.3%, and 6.3% of the entire Salt Lake City market for the years 1959, 1960, and 1961, respectively, and to 64%, 44%, and 22% of Pet's own Salt Lake City sales for those same years.

Second, it introduced a 20-ounce economy pie under the "Swiss Miss" label and began selling the new pie in the Salt Lake market in August 1960 at prices ranging from $3.25 to $3.30 for the remainder of the period. This pie was at times sold at a lower price in the Salt Lake City market than it was sold in other markets.

Third, Pet became more competitive with respect to the prices for its "Pet-Ritz" proprietary label. For 18 of the relevant 44 months its offering price for Pet-Ritz pies was $4 per dozen or lower, and $3.70 or lower for six of these months. According to the Court of Appeals, in seven of the 44 months Pet's prices in Salt Lake were lower than prices charged in the California markets. This was true although selling in Salt Lake involved a 30- to 35-cent freight cost.

The Court of Appeals first concluded that Pet's price differential on sales to Safeway must be put aside in considering injury to competition because in its view of the evidence the differential had been completely cost justified and because Utah would not in any event have been able to enjoy the Safeway custom. Second, it concluded that the remaining discriminations on "Pet-Ritz" and "Swiss Miss" pies were an insufficient predicate on which the jury could have found a reasonably possible injury either to Utah Pie as a competitive force or to competition generally.

We disagree with the Court of Appeals in several respects. First, there was evidence from which the jury

could have found considerably more price discrimination by Pet with respect to "Pet-Ritz" and "Swiss Miss" pies than was considered by the Court of Appeals. In addition to the seven months during which Pet's prices in Salt Lake were lower than prices in the California markets, there was evidence from which the jury could reasonably have found that in 10 additional months the Salt Lake City prices for "Pet-Ritz" pies were discriminatory as compared with sales in western markets other than California. Likewise, with respect to "Swiss Miss" pies, there was evidence in the record from which the jury could have found that in five of the 13 months during which the "Swiss Miss" pies were sold prior to the filing of this suit, prices in Salt Lake City were lower than those charged by Pet in either California or some other western market.

Second, with respect to Pet's Safeway business, the burden of proving cost justification was on Pet [9] and, in our view, reasonable men could have found that Pet's lower priced, "Bel-air" sales to Safeway were not cost justified in their entirety. Pet introduced cost data for 1961 indicating a cost saving on the Safeway business greater than the price advantage extended to that customer. These statistics were not particularized for the Salt Lake market, but assuming that they were adequate to justify the 1961 sales, they related to only 24% of the Safeway sales over the relevant period. The evidence concerning the remaining 76% was at best incomplete and inferential. It was insufficient to take the

---

[9] Section 2 (b) of the Robinson-Patman Act assigns the burden. "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section . . . ." 49 Stat, 1526, 15 U. S. C. § 13 (b). See *F. T. C.* v. *Morton Salt Co.,* 334 U. S. 37, 44–45; *United States* v. *Borden Co.,* 370 U. S. 460, 467.

defense of cost justification from the jury, which reasonably could have found a greater incidence of unjustified price discrimination than that allowed by the Court of Appeals' view of the evidence.[10]

With respect to whether Utah would have enjoyed Safeway's business absent the Pet contract with Safeway, it seems clear that whatever the fact is in this regard, it is not determinative of the impact of that contract on competitors other than Utah and on competition generally. There were other companies seeking the Safeway business, including Continental and Carnation, whose pies may have been excluded from the Safeway shelves by what the jury could have found to be discriminatory sales to Safeway.[11] What is more, Pet's evidence that Utah's unwillingness to install quality control equipment prevented Utah from enjoying Safeway's private label business is not the only evidence in the record relevant to that question. There was other evidence to the con-

---

[10] The only evidence cited by the Court of Appeals to justify the remaining 76% of Pet's sales to Safeway was Safeway's established practice of requiring its sellers to cost justify sales that otherwise would be illegally discriminatory. This practice was incorporated in the Pet-Safeway contract. We are unprepared to hold that a contractual obligation to cost justify price differentials is legally dispositive proof that such differentials are in fact so justified. Pet admitted that its cost-justification figures were drawn from past performance, so even crediting the data accompanying the 1960 contract regarding cost differences, Pet's additional evidence would bring under the justification umbrella only the 1959 sales. Thus, at the least, the jury was free to consider the 1960 Safeway sales as inadequately cost justified. Those sales accounted for 12.3% of the entire Salt Lake City market in that year. In the context of this case, the sales to Safeway are particularly relevant since there was evidence that private label sales influenced the general market, in this case depressing overall market prices.

[11] The jury was in fact charged that it could find for petitioner if from respondents' conduct "there is reasonably likely to be a substantial injury to competition *among sellers of frozen pies in the Utah area.*" R., at 1355. (Emphasis supplied.)

trary. The jury would not have been compelled to find that Utah Pie could not have gained more of the Safeway business.

Third, the Court of Appeals almost entirely ignored other evidence which provides material support for the jury's conclusion that Pet's behavior satisfied the statutory test regarding competitive injury. This evidence bore on the issue of Pet's predatory intent to injure Utah Pie.[12] As an initial matter, the jury could have con-

---

[12] The dangers of predatory price discrimination were recognized in *Moore* v. *Mead's Fine Bread Co.*, 348 U. S. 115, where such pricing was held violative of § 2 (a). Subsequently, the Court noted that "the decisions of the federal courts in primary-line-competition cases . . . consistently emphasize the unreasonably low prices and the predatory intent of the defendants." *F. T. C.* v. *Anheuser-Busch, Inc.*, 363 U. S. 536, 548. See also *Balian Ice Cream Co.* v. *Arden Farms Co.*, 231 F. 2d 356, 369; *Maryland Baking Co.* v. *F. T. C.*, 243 F. 2d 716; *Atlas Building Prod. Co.* v. *Diamond Block & Gravel Co.*, 269 F. 2d 950; *Anheuser-Busch, Inc.* v. *F. T. C.*, 289 F. 2d 835. In the latter case the court went so far as to suggest that:

"If . . . the projection [to ascertain the future effect of price discrimination] is based upon predatoriness or buccaneering, it can reasonably be forecast that an adverse effect on competition *may* occur. In that event, the discriminations in their incipiency are such that they *may* have the prescribed effect to establish a violation of § 2 (a). If one engages in the latter type of pricing activity, a reasonable probability may be inferred that its willful misconduct may substantially lessen, injure, destroy or prevent competition." 289 F. 2d, at 843.

Chief Justice Hughes noted in a related antitrust context that "knowledge of actual intent is an aid in the interpretation of facts and prediction of consequences." *Appalachian Coals, Inc.* v. *United States*, 288 U. S. 344, 372, and we do not think it unreasonable for courts to follow that lead. Although the evidence in this regard against Pet seems obvious, a jury would be free to ascertain a seller's intent from surrounding economic circumstances, which would include persistent unprofitable sales below cost and drastic price cuts themselves discriminatory. See Rowe, Price Discrimination Under the Robinson-Patman Act 141–150 (1962), commenting on the

cluded that Pet's discriminatory pricing was aimed at Utah Pie; Pet's own management, as early as 1959, identified Utah Pie as an "unfavorable factor," one which "d[u]g holes in our operation" and posed a constant "check" on Pet's performance in the Salt Lake City market. Moreover, Pet candidly admitted that during the period when it was establishing its relationship with Safeway, it sent into Utah Pie's plant an industrial spy to seek information that would be of use to Pet in convincing Safeway that Utah Pie was not worthy of its custom. Pet denied that it ever in fact used what it had learned against Utah Pie in competing for Safeway's business. The parties, however, are not the ultimate judges of credibility. But even giving Pet's view of the incident a measure of weight does not mean the jury was foreclosed from considering the predatory intent underlying Pet's mode of competition. Finally, Pet does not deny that the evidence showed it suffered substantial losses on its frozen pie sales during the greater part of the time involved in this suit, and there was evidence from which the jury could have concluded that the losses Pet sustained in Salt Lake City were greater than those incurred elsewhere. It would not have been an irrational step if the jury concluded that there was a relationship between price and the losses.

It seems clear to us that the jury heard adequate evidence from which it could have concluded that Pet had engaged in predatory tactics in waging competitive warfare in the Salt Lake City market. Coupled with the incidence of price discrimination attributable to Pet,

Court's statement in *F. T. C. v. Anheuser-Busch, Inc., supra,* that "a price reduction below cost tends to establish [predatory] intent." 363 U. S., at 552. See also *Ben Hur Coal Co. v. Wells,* 242 F. 2d 481, 486, and *Balian Ice Cream Co. v. Arden Farms Co., supra,* at 368, in which the courts recognized the inferential value of sales below cost on the issue of intent.

the evidence as a whole established, rather than negated, the reasonable possibility that Pet's behavior produced a lessening of competition proscribed by the Act.

## II.

Petitioner's case against Continental is not complicated. Continental was a substantial factor in the market in 1957. But its sales of frozen 22-ounce dessert pies, sold under the "Morton" brand, amounted to only 1.3% of the market in 1958, 2.9% in 1959, and 1.8% in 1960. Its problems were primarily that of cost and in turn that of price, the controlling factor in the market. In late 1960 it worked out a co-packing arrangement in California by which fruit would be processed directly from the trees into the finished pie without large intermediate packing, storing, and shipping expenses. Having improved its position, it attempted to increase its share of the Salt Lake City market by utilizing a local broker and offering short-term price concessions in varying amounts. Its efforts for seven months were not spectacularly successful. Then in June 1961, it took the steps which are the heart of petitioner's complaint against it. Effective for the last two weeks of June it offered its 22-ounce frozen apple pies in the Utah area at $2.85 per dozen. It was then selling the same pies at substantially higher prices in other markets. The Salt Lake City price was less than its direct cost plus an allocation for overhead. Utah's going price at the time for its 24-ounce "Frost 'N' Flame" apple pie sold to Associated Grocers was $3.10 per dozen, and for its "Utah" brand $3.40 per dozen. At its new prices, Continental sold pies to American Grocers in Pocatello, Idaho, and to American Food Stores in Ogden, Utah. Safeway, one of the major buyers in Salt Lake City, also purchased 6,250 dozen, its requirements for about five weeks. Another purchaser ordered 1,000 dozen. Utah's response was immediate. It reduced

its price on all of its apple pies to $2.75 per dozen. Continental refused Safeway's request to match Utah's price, but renewed its offer at the same prices effective July 31 for another two-week period. Utah filed suit on September 8, 1961. Continental's total sales of frozen pies increased from 3,350 dozen in 1960 to 18,800 dozen in 1961. Its market share increased from 1.8% in 1960 to 8.3% in 1961. The Court of Appeals concluded that Continental's conduct had had only minimal effect, that it had not injured or weakened Utah Pie as a competitor, that it had not substantially lessened competition and that there was no reasonable possibility that it would do so in the future.

We again differ with the Court of Appeals. Its opinion that Utah was not damaged as a competitive force apparently rested on the fact that Utah's sales volume continued to climb in 1961 and on the court's own factual conclusion that Utah was not deprived of any pie business which it otherwise might have had. But this retrospective assessment fails to note that Continental's discriminatory below-cost price caused Utah Pie to reduce its price to $2.75. The jury was entitled to consider the potential impact of Continental's price reduction absent any responsive price cut by Utah Pie. Price was a major factor in the Salt Lake City market. Safeway, which had been buying Utah brand pies, immediately reacted and purchased a five-week supply of frozen pies from Continental, thereby temporarily foreclosing the proprietary brands of Utah and other firms from the Salt Lake City Safeway market. The jury could rationally have concluded that had Utah not lowered its price, Continental, which repeated its offer once, would have continued it, that Safeway would have continued to buy from Continental and that other buyers, large as well as small, would have followed suit. It could also have reasonably concluded that a competitor who is forced to

reduce his price to a new all-time low in a market of declining prices will in time feel the financial pinch and will be a less effective competitive force.

Even if the impact on Utah Pie as a competitor was negligible, there remain the consequences to others in the market who had to compete not only with Continental's 22-ounce pie at $2.85 but with Utah's even lower price of $2.75 per dozen for both its proprietary and controlled labels. Petitioner and respondents were not the only sellers in the Salt Lake City market, although they did account for 91.8% of the sales in 1961. The evidence was that there were nine other sellers in 1960 who sold 23,473 dozen pies, 12.7% of the total market. In 1961 there were eight other sellers who sold less than the year before—18,565 dozen or 8.2% of the total— although the total market had expanded from 184,569 dozen to 226,908 dozen. We think there was sufficient evidence from which the jury could find a violation of § 2 (a) by Continental.

### III.

The Carnation Company entered the frozen dessert pie business in 1955 through the acquisition of "Mrs. Lee's Pies" which was then engaged in manufacturing and selling frozen pies in Utah and elsewhere under the "Simple Simon" label. Carnation also quickly found the market extremely sensitive to price. Carnation decided, however, not to enter an economy product in the market, and during the period covered by this suit it offered only its quality "Simple Simon" brand. Its primary method of meeting competition in its markets was to offer a variety of discounts and other reductions, and the technique was not unsuccessful. In 1958, for example, Carnation enjoyed 10.3% of the Salt Lake City market, and although its volume of pies sold in that market increased substantially in the next year, its percentage of the market temporarily slipped to 8.6%. However, 1960 was a turnaround year for Carnation in

the Salt Lake City market; it more than doubled its volume of sales over the preceding year and thereby gained 12.1% of the market. And while the price structure in the market deteriorated rapidly in 1961 Carnation's position remained important.

We need not dwell long upon the case against Carnation, which in some respects is similar to that against Continental and in others more nearly resembles the case against Pet. After Carnation's temporary setback in 1959 it instituted a new pricing policy to regain business in the Salt Lake City market. The new policy involved a slash in price of 60¢ per dozen pies, which brought Carnation's price to a level admittedly well below its costs, and well below the other prices prevailing in the market. The impact of the move was felt immediately, and the two other major sellers in the market reduced their prices. Carnation's banner year, 1960, in the end involved eight months during which the prices in Salt Lake City were lower than prices charged in other markets. The trend continued during the eight months in 1961 that preceded the filing of the complaint in this case. In each of those months the Salt Lake City prices charged by Carnation were well below prices charged in other markets, and in all but August 1961 the Salt Lake City delivered price was 20¢ to 50¢ lower than the prices charged in distant San Francisco. The Court of Appeals held that only the early 1960 prices could be found to have been below cost. That holding, however, simply overlooks evidence from which the jury could have concluded that throughout 1961 Carnation maintained a below-cost price structure and that Carnation's discriminatory pricing, no less than that of Pet and Continental, had an important effect on the Salt Lake City market. We cannot say that the evidence precluded the jury from finding it reasonably possible that Carnation's conduct would injure competition.

## IV.

Section 2 (a) does not forbid price competition which will probably injure or lessen competition by eliminating competitors, discouraging entry into the market or enhancing the market shares of the dominant sellers. But Congress has established some ground rules for the game. Sellers may not sell like goods to different purchasers at different prices if the result may be to injure competition in either the sellers' or the buyers' market unless such discriminations are justified as permitted by the Act. This case concerns the sellers' market. In this context, the Court of Appeals placed heavy emphasis on the fact that Utah Pie constantly increased its sales volume and continued to make a profit. But we disagree with its apparent view that there is no reasonably possible injury to competition as long as the volume of sales in a particular market is expanding and at least some of the competitors in the market continue to operate at a profit. Nor do we think that the Act only comes into play to regulate the conduct of price discriminators when their discriminatory prices consistently undercut other competitors. It is true that many of the primary line cases that have reached the courts have involved blatant predatory price discriminations employed with the hope of immediate destruction of a particular competitor. On the question of injury to competition such cases present courts with no difficulty, for such pricing is clearly within the heart of the proscription of the Act. Courts and commentators alike have noted that the existence of predatory intent might bear on the likelihood of injury to competition.[13] In this case there was some evidence of predatory intent with respect to each of these respondents.[14] There was also other evidence upon which the

---

[13] See n. 12, *supra*.

[14] It might be argued that the respondents' conduct displayed only fierce competitive instincts. Actual intent to injure another

jury could rationally find the requisite injury to competition. The frozen pie market in Salt Lake City was highly competitive. At times Utah Pie was a leader in moving the general level of prices down, and at other times each of the respondents also bore responsibility for the downward pressure on the price structure. We believe that the Act reaches price discrimination that erodes competition as much as it does price discrimination that is intended to have immediate destructive impact. In this case, the evidence shows a drastically declining price structure which the jury could rationally attribute to continued or sporadic price discrimination. The jury was entitled to conclude that "the effect of such discrimination," by each of these respondents, "may be substantially to lessen competition . . . or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination . . . ." The statutory test is one that necessarily looks forward on the basis of proven conduct in the past. Proper application of that standard here requires reversal of the judgment of the Court of Appeals.[15]

competitor does not, however, fall into that category, and neither, when viewed in the context of the Robinson-Patman Act, do persistent sales below cost and radical price cuts themselves discriminatory. Nor does the fact that a local competitor has a major share of the market make him fair game for discriminatory price cutting free of Robinson-Patman Act proscriptions. "The Clayton Act proscription as to discrimination in price is not nullified merely because of a showing that the existing competition in a particular market had a major share of the sales of the product involved." *Maryland Baking Co.*, 52 F. T. C. 1679, 1689, aff'd, 243 F. 2d 716. In that case the local competitor's share of the market when price discrimination began was 91.3%, yet the Federal Trade Commission was not impressed by the argument that the effect of the discrimination had been to terminate a monopoly and to create a competitive market.

[15] Each respondent argues here that prior price discrimination cases in the courts and before the Federal Trade Commission, in which no primary line injury to competition was found, establish

Since the Court of Appeals held that petitioner had failed to make a prima facie case against each of the respondents, it expressly declined to pass on other grounds for reversal presented by the respondents. 349 F. 2d 122, 126. Without intimating any views on the other grounds presented to the Court of Appeals, we reverse its judgment and remand the case to that court for further proceedings.                          *It is so ordered.*

THE CHIEF JUSTICE took no part in the decision of this case.

MR. JUSTICE STEWART, with whom MR. JUSTICE HARLAN joins, dissenting.

I would affirm the judgment, agreeing substantially with the reasoning of the Court of Appeals as expressed

---

a standard which compels affirmance of the Court of Appeals' holding. But the cases upon which the respondents rely are readily distinguishable. In *Anheuser-Busch, Inc.* v. *F. T. C.,* 289 F. 2d 835, 839, there was no general decline in price structure attributable to the defendant's price discriminations, nor was there any evidence that the price discriminations were "a single lethal weapon aimed at a victim for a predatory purpose." *Id.,* at 842. In *Borden Co.* v. *F. T. C.,* 339 F. 2d 953, the court reversed the Commission's decision on price discrimination in one market for want of sufficient interstate connection, and the Commission's charge regarding the other market failed to show any lasting impact upon prices caused by the single, isolated incident of price discrimination proved. Absence of proof that the alleged injury was due to challenged price discriminations was determinative in *International Milling Co.,* CCH Trade Reg. Rep. Transfer Binder, 1963–1965, ¶¶ 16,494, 16,648. In *Uarco, Inc.,* CCH Trade Reg. Rep. Transfer Binder, 1963–1965, ¶ 16,807, there was no evidence from which predatory intent could be inferred and no evidence of a long-term market price decline. Similar failure of proof and absence of sales below cost were evident in *Quaker Oats Co.,* CCH Trade Reg. Rep. Transfer Binder, 1963–1965, ¶ 17,134. *Dean Milk Co.,* 3 Trade Reg. Rep. ¶ 17,357, is not to the contrary. There in the one market where the Commission found no primary line injury there was no evidence of a generally declining price structure.

in the thorough and conscientious opinion of Judge Phillips.

There is only one issue in this case in its present posture: Whether the respondents engaged in price discrimination "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination . . . ." [1] Phrased more simply, did the respondents' actions have the anticompetitive effect required by the statute as an element of a cause of action?

The Court's own description of the Salt Lake City frozen pie market from 1958 through 1961, shows that the answer to that question must be no.[2] In 1958 Utah Pie had a quasi-monopolistic 66.5% of the market. In 1961—after the alleged predations of the respondents— Utah Pie still had a commanding 45.3%, Pet had 29.4%, and the remainder of the market was divided almost equally between Continental, Carnation, and other, small local bakers. Unless we disregard the lessons so laboriously learned in scores of Sherman and Clayton Act cases, the 1961 situation has to be considered more competitive than that of 1958. Thus, if we assume that the price discrimination proven against the respondents had any effect on competition, that effect must have been beneficent.

That the Court has fallen into the error of reading tl e Robinson-Patman Act as protecting competitors, instead of competition, can be seen from its unsuccessful attempt to distinguish cases relied upon by the respondents.[3] Those cases are said to be inapposite because they

---

[1] Section 2 (a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U. S. C. § 13 (a).

[2] See *ante*, p. 691, n. 7.

[3] See *ante*, p. 703, n. 15.

involved "no general decline in price structure," and no "lasting impact upon prices." But lower prices are the hallmark of intensified competition.

The Court of Appeals squarely identified the fallacy which the Court today embraces:

> ". . . a contention that Utah Pie was entitled to hold the extraordinary market share percentage of 66.5, attained in 1958, falls of its own dead weight. To approve such a contention would be to hold that Utah Pie was entitled to maintain a position which approached, if it did not in fact amount to a monopoly, and could not exist in the face of proper and healthy competition." 349 F. 2d 122, 155.

I cannot hold that Utah Pie's monopolistic position was protected by the federal antitrust laws from effective price competition, and I therefore respectfully dissent.