The **MORNING PIONEER, INC.,**
Plaintiff,

v.

The **BISMARCK TRIBUNE CO.,** a
corporation, **Defendant.**

**Civ. No. 996.**

United States District Court,
D. North Dakota,
Southwestern Division.

June 7, 1972.

Robert Vogel, Vogel, Bair & Graff, Mandan, N. D., for plaintiff.

Daniel J. Chapman and Richard P. Rausch, Rausch & Chapman, Bismarck, N. D., for defendant.

## MEMORANDUM OF DECISION

VAN SICKLE, District Judge.

This action arises under:

15 U.S.C. § 2 (attempting to monopolize trade);

15 U.S.C. § 13(a) (discrimination in prices);

15 U.S.C. § 15 (suits by persons injured); and

15 U.S.C. § 26 (injunctive relief).

This Court has jurisdiction. (28 U.S. C. § 1337)

This action, grounded in restraint of trade, was filed on August 28, 1969. The Plaintiff, Pioneer, Inc., alleges that its competitor, The Bismarck Tribune Company, Defendant, has committed acts which constituted illegal restraint of trade and which tended to destroy competition in violation of the Sherman Anti-Trust Act and the Robinson-Patman Act.

Both of these newspapers have figured prominently in the history of this state. The Bismarck Tribune's history antedates statehood. Its list of several publishers includes Colonel Clement A. Lounsberry, famed for his handling of the story of the Custer massacre. It dominates the newspaper market in the southwest quarter of North Dakota.

The Mandan Pioneer's history also antedates statehood. Its parent predecessor includes among its first stockholders the Marquis deMores and Theodore Roosevelt.

Mandan, the city where the Pioneer is based, is located just seven miles west of Bismarck, across the Missouri River. For many years and even today to a lesser extent, it had a unique advantage in distribution to the southwest because it is west of the Missouri River, a great natural barrier. (In all of North Dakota, there is only one railroad crossing, Bismarck, and five highway crossings of this great river. Two bridges at Bismarck are counted as one crossing.)

For many years prior to 1963, The Bismarck Tribune had been controlled by the Mann family. George Mann was publisher in 1917 and 1918. His widow, Stella Mann, was publisher and then president of the corporation from 1918 to the present.

In 1948, Alton G. (Glenn) Sorlie came into The Bismarck Tribune. He became publisher in 1962.

The Tostevins had controlled the Mandan Pioneer over the same period. E. A. Tostevin had bought the paper in 1909, and held it until his death in 1943. His sons were E. D. Tostevin, who was alive in 1963; Earl H. Tostevin, whose widow, Agnes, was alive in 1963; and Walter C. Tostevin, whose widow, Doris, was alive in 1963.

Prior to 1963, the Tostevins and the Manns had an arrangement whereby national advertising was sold on the basis of the combined circulation of the papers, and the proceeds were distributed three-fourths to The Bismarck Tribune and one-fourth to the Mandan Pioneer.

The two newspapers also had a joint rate card for those advertisements which were locally sold to both papers. The proceeds from these joint ads were also distributed between the papers.

For some time prior to 1963, there had been a tacit understanding that when the Tostevins decided to sell, The Bismarck Tribune could expect to buy. During this period of time (before 1963), there was no aggressive effort on the part of either paper to move into the home town of the other. Both papers shared the southwest quarter of the state amicably, with The Bismarck Tribune clearly being the dominant paper.

With the death of Walter Tostevin in 1960 or 1962, leisurely negotiations for the sale of the Mandan Pioneer quickened. About the same time, Alton G. Sorlie took over as publisher of The Bismarck Tribune, and immediately began an aggressive campaign to build up the paper.

The national advertising program had been mutually unsatisfactory for some time. On January 3, 1963, The Bismarck Tribune wrote to Standard Rate & Data Service, Inc., to advise it of the cancellation to be effective March 1, 1963. On January 11, 1963, the Mandan Pioneer wrote to Standard Rate & Data Service, Inc., giving the same information. Thus, up to March 1, 1963, both parties had engaged in a monopolistic agreement, damaging to the Bismarck-Mandan community within the concepts of the acts. (See Citizen Pub. Co. v. United States, 394 U.S. 131, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) and Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953))

In 1963, the situation underwent many rapid changes. The Tostevins elected to sell to the Conrad family, another old publishing family in Bismarck. (E. J. Conrad had been in the publishing business in Bismarck and had published several papers in addition to his job printing business. The Conrads involved here are his three sons, Currie, John and Charles, all of whom grew up in the business. A fourth son, Gaylord, was also involved in the family publishing business until the time of his death. In addition, the business also now employs some of the third generation of Conrads in the persons of Dean, Roan and Mark.)

In January, 1963, Glenn Sorlie began his aggressive and vigorous expansion program of The Bismarck Tribune. One of his first acts was to hire Tom Schofield, a circulation expert, as his circulation manager. The Conrads at the Pioneer also undertook an aggressive expansion program into Bismarck. One of their early steps was to change the paper into a morning paper and rename it the "Morning Pioneer". These competitive expansion programs and the methods used by The Bismarck Tribune to further its expansion led to this suit. The Morning Pioneer, plaintiff, alleges that several types of conduct on the part of The Bismarck Tribune were unlawful in that it was conduct which was likely to destroy competition and create a monopoly, all in violation of the Sherman Anti-Trust Act and the Robinson-Patman Act.

## LIABILITY

The conduct which is alleged to be illegal was manifested by a number of acts. These were:

1. *The attempted purchase of the Pioneer by the Tribune.*

The Pioneer has alleged the attempt by the Tribune to purchase the Pioneer in 1963 was an illegal attempt to destroy competition. The fact of the attempted purchase was established but the act was not illegal within the meaning of the statute because its effect was to continue an already defacto situation.

2. *Giveaways.* The fact of the giveaway programs was proven, but they were not proven to be anti-competitive within the meaning of the act.

3. *Hiring away employees.* The Pioneer alleged that the Tribune hired, and attempted to hire, the Pioneer's key employees. The only proofs were:

a) As to the hiring of Feickerts, who, the officers of the Pioneer admitted, were released by the Pioneer before they were hired by the Tribune.

b) The transcript of the telephone call by Mr. Enze to Mr. Miller of the Tribune. This transcript suggests that Mr. Enze was attempting entrapment, and Mr. Miller was attempting to garner information, with the outcome a draw.

4. *Advertising rate discrimination.* The affirmative proofs on this allegation were proof of charges for a large combination ad that a number of Mandan stores placed in the Tribune; and proof of the Mushik Shoe Store special rate. The special Mushik rate was disproved by the testimony of Mr. MacLeish, comptroller of the Tribune Company, and the evidence that he introduced. The combined ad produced a special rate, if at all, only as an accident of the special section technique of selling ads. It was a special ad, at Christmas time, and was a block ad allotted to the Mandan merchants. It was not shown to be discriminatory.

5. *Cancellation of the joint advertising agreement.* It was alleged that the cancellation of the joint advertising agreement, an illegal agreement from its inception, was a violation of the Act. This cancellation took place before the sale of the Pioneer, and the beginning of the competition. I fail to see how the cancellation of an agreement that is in restraint of trade can be an act also in restraint of trade.

6. *Price discrimination.* The evidence shows that The Bismarck Tribune sold for a lower price by carrier outside of Bismarck than it did by carrier in Bismarck, from a time before 1940 until 1970. Plaintiff neither claimed nor offered proof that the price differences were illegal elsewhere than in Mandan. I, therefore will only discuss the price differences in Mandan.

A small minority of rural daily papers have a policy of reduced price outside the town of publication in those areas where the paper arrives cold. Initially, the reason for the lower price for the Bismarck paper in Mandan was validly based on a lesser value to the reader. The paper arrived later, contained less local news, and the bulk of the advertising was of no interest to the reader who did not shop in Bismarck stores. Until the completion of Highway I–94, and the development of the large Bismarck shopping centers combined to change shopping patterns drastically, the price differential was justified. This justification slowly eroded away, as regards Mandan at least, and, as a result, the price was equalized in 1970.

There was only a short period when The Bismarck Tribune rates, by carrier in Mandan, were lower than those charged for the Morning Pioneer, and that resulted from a raise in the rate of the Pioneer. I find that The Bismarck Tribune cold (old) in Mandan is not of "like grade and quality" as The Bismarck Tribune hot (new) in Bismarck. By the same token, I find that the effect of the price discrimination was not "substantially to lessen competition or tend to create a monopoly" within 15 U.S.C. § 13(a).

7. *Blanketing.* As shown by Defendant's Exhibit O, there was considerable blanketing of Mandan by The Bismarck Tribune especially in 1963 and 1965. In 1963, there were five instances of blanketing during the first three months. This blanketing was in furtherance of a legitimate attempt by the Tribune to enter the Mandan market, now open to them after the cancellation of the previous illegal agreement, and was not an unreasonable or illegal method to reach that end.

■ Intensive blanketing occurred during the months of April and May. Starting on April 15, 1963, the Tribune blanketed Mandan every day, six days a week, for three straight weeks, rested two weeks, and then blanketed again for a week. Again in September and October, the Tribune intensified its blanketing, with thirteen occurrences during this period. Further, seven of these were on Wednesdays, when the grocery ads, the largest newspaper advertisers in the area, were run. I find that the blanketing in these two periods was a violation of the Sherman Anti-Trust Act.

■ The blanketing done during the remainder of 1963, and that done in 1964, was scattered and was reasonable competition in the City of Mandan beneficial to the community, correcting the prior situation which existed when there was an illegal agreement in restraint of free competition. (It must be kept in mind that our purpose is the protection of competition, rather than protection of the competitor. Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967)).

In 1965, the Tribune blanketed Mandan eight days in January, eight days in February, and seven days in March. This blanketing was timed to specific days of the week to occur when the effect on the Pioneer was magnified due to interference with grocery advertising. The Pioneer suffered a loss of one-third of its grocery advertising during six weeks of this blanketing campaign according to the evidence. I find that this blanketing was a violation of the Sherman Anti-Trust Act. Conduct which might have been permissible by a dominated newspaper, the Pioneer, working in Bismarck, was so heavy-handed when done by the dominant newspaper, working in Mandan, as to tend to effect a destruction of the competition in the industry in the area.

■ I realize that we must consider the evidence as a whole and must not tightly compartmentalize the various factual components, and wipe the slate clean after scrutiny of each. (Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679 (CA 8 1966)). Nevertheless, I find that the conduct of the Bismarck Tribune, whether considered in its separate parts or as a whole, did not constitute an act in restraint of trade. I reiterate that both papers, following March of 1962, responded to the termination of a non-competitive agreement with aggressive, but reasonably competitive conduct, except for the blanketing previously discussed.

### DAMAGES

■ While it is true that an injured competitor, in cases brought under 15 U.S.C. § 15, does not have to prove the extent of his damages with particularity, there must be some affirmative showing of the existence and extent of the damage. (Siegfried v. Kansas City Star Co., 298 F.2d 1 (CA 8 1962); Colasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (CA 6 1962) cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717; Associated Press v. Taft-Ingalls Corp., 340 F.2d 753 (CA 6 1965); Household Goods Carriers Bureau v. Terrell, 417 F.2d 47 (CA 5 1969)). In this case, such proof is almost non-existent. There was no proof as to the specific effect of the various blanketing episodes on circulation. The Court has, therefore, no logical basis for separating any effects flowing from the illegal incidents from the effects of the lawful blanketing.

There is also a great deal of evidence of mismanagement at the Pioneer. Circulation is the lifeblood of a newspaper. Reliable circulation figures are the first prerequisite for the sale of advertising. Yet the Pioneer's records are so bad that the extent of circulation for a period of three years can only be estimated, and, for a fourth, the plaintiff could not even make an estimate. The effect of this mismanagement on the fortunes of the Pioneer must have been substantial; and it would be an impossible task to sort out the circulation history attributable to the acts proven illegal from that due to mismanagement or to normal, legal competition.

Rules of thumb for determining values from circulation were brought out by Mr. Charles Conrad and Mr. Walter Kerr. In summary, these rules are:

a) In a competitive situation, the value of a daily newspaper can be determined by multiplying the number of paid subscriptions by $100.00.

b) In a monopolistic situation, the value can be determined by multiplying the number of paid subscriptions by $200.00 to $300.00.

c) A variance in paid subscriptions of less than 500, is considered of no moment in the application of these rules.

d) The cost of the newspaper plant is not considered as a relevant factor in the application of these rules.

There is no substantial proof of any damage to circulation, let alone loss of 500 or more subscribers.

As to the circulation charts and other charted damage evidence, while the assumptions were well programmed, the bases for such assumptions were not proved. Exhibits 50 and 51 are particularly misleading. Charles Conrad put the true paid circulation of the Pioneer at 3,200 in 1963, when he bought it. Plaintiff's charts, Exhibit 50 and 51, are based on Audit Bureau of Circulation (ABC) figures, which show a 1963 circulation of 4,045. The Audit Bureau of Circulation reports for the Pioneer in 1963, 1964 and 1965 reflect the ABC's distrust of the Pioneer's circulation figures. All circulation figures for the Pioneer are questionable.

■ I must, therefore, hold that there can be no recovery for any lost circulation because to do so would require the Court to speculate as to the amount of the damages.

We are left with the damages due to the lost advertising revenue which came about as a result of the 1965 blanketing held to be illegal. The evidence showed that the Pioneer lost one-third of its grocery advertising for a period of five weeks. There was no proof as to what the grocery advertising revenue had been prior to that time, and, therefore, I hold that there has been no proof of loss with sufficient particularity to allow the calculation of damages, and I award the Plaintiff the sum of one dollar, his costs and reasonable attorney fees.

■ There being no continuing threat of a resumption of illegal conduct, the prayer for an injunction is denied.

Attorney for the Plaintiff shall submit a judgment in accordance herewith.