Eleanor G. MORTON et al.

v.

NATIONAL DAIRY PRODUCTS CORP.

Civ. A. No. 30594.

United States District Court
E. D. Pennsylvania.

July 17, 1968.

William S. Rawls, Philadelphia, Pa., for plaintiffs.

Owen B. Rhoads, Philadelphia, Pa., for defendant.

## OPINION

JOHN W. LORD, Jr., District Judge.

This suit involves an alleged violation of the Clayton Antitrust Act, as amended by § 2(a) of the Robinson-Patman Act. 38 Stat. 730 (1914); 49 Stat. 1526 (1936), 15 U.S.C. § 13(a). Specifically, plaintiffs contend that the defendant violated these antitrust statutes through its out-of-state sales of milk to Pennsylvania chain store purchasers at prices in variance with those prices the defendant charged on Pennsylvania into-the-store sales made pursuant to the Pennsylvania Milk Control Act. The case was tried by the Court, without a jury, during the course of a fifteen day trial, whereupon the Court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

#### The Parties

1. The plaintiffs (hereafter "Pennbrook") are a partnership operating the Pennbrook Milk Company, a milk processing concern with its single plant located in Philadelphia, Pennsylvania. Pennbrook Milk Company is a family owned and operated business. The owners also operate Pennbrook Vending Company and Pennbrook Ice Cream Company. The Milk Company owns the Vending Company. The Ice Cream Company is owned by Mrs. David M. Gwinn, the wife of the managing partner of the Milk Company.

2. The three Pennbrook enterprises are conducted on a combined basis, in a single building, with the same processing, office, sales and distribution personnel.

3. The defendant National Dairy Products Corporation (hereafter "Sealtest") is a major national dairy corporation and operates the division of Sealtest Foods which conducts a milk processing and sales business in southeastern Pennsylvania, southern New Jersey and Delaware.

#### Relevant Geographic Market

4. The relevant geographic market, in which Pennbrook, Sealtest, and other milk companies compete in the sale of milk and dairy products, as demonstrated by the evidence produced during the course of the trial, is the distinct geographic market encompassing southeastern Pennsylvania, southern New Jersey and Delaware, termed the lower Delaware Valley.

#### Relevant Functional Market

5. Functionally, the above geographic market breaks down into two categories: (1) retail, consisting of home delivered or home service sales, and (2) wholesale, consisting of sales to hotels, restaurants, hospitals, industrial plants, vending customers, food service customers and stores.

6. The usual industry practice of milk companies dealing in the relevant geographic market is not to divide the wholesale market into classes or types of customers, but to treat all wholesale customers as one functional market.

7. Pennbrook does not compete with Sealtest in the retail market because Pennbrook does not make any retail sales, although both compete in the wholesale market for a variety of customers.

8. Milk companies such as Pennbrook and Sealtest are subject to stringent price regulation in both Pennsylvania and New Jersey. These companies are regulated in Pennsylvania by the Pennsylvania Milk Control Commission (hereafter "PMCC") and by the Office of Milk Industry (hereafter "OMI") in New Jersey.

## Market Conditions

9. Milk companies do compete within the relevant market, although free price competition is hampered in the intrastate New Jersey and Pennsylvania markets as each seller must conform to the price floors established under the aegis of the local milk control laws.

10. From Pennbrook's inception in 1941, its largest single customer was Penn Fruit, a Pennsylvania corporation, which operates a chain of supermarkets in Pennsylvania, New York, New Jersey, Delaware and Maryland.

11. Wholesale customers of milk companies demonstrate market mobility in changing their sources of supply from one milk company to another within the relevant market.

12. Although Pennbrook, Sealtest and several other milk companies agreed in writing, in July 1961, to eliminate advertising payments to wholesale customers, Pennbrook subsequently made substantial advertising payments in breach of this agreement.

13. In addition, Pennbrook made loans of capital and refrigeration equipment in attempts to side-step the impact of the uniform price floors imposed by the PMCC.

14. Pennbrook acquired the business of the Quaker City Wholesale Grocers Association (Penn Treaty Stores) through advertising payments and in 1962 Pennbrook's volume of business with these stores increased three-fold to $343,000.00 per year. By 1964 Pennbrook was paying in excess of $100,000.-00 to its customers per year.

15. A significant factor in the relevant wholesale market in recent years has been a rapid increase in the volume of milk sold in vending machines. Pennbrook gives large discounts to its vending customers and this practice has enabled Pennbrook's share of the wholesale vending business to increase at a faster rate than the increase in the volume of the overall vending business sales. Pennbrook now handles approximately 60 to 70% of the vending business in the relevant wholesale market.

16. Clearly, the two major market factors in the lower Delaware Valley milk market in the past ten years have been the trend toward the vertical integration of wholesale marketing facilities and the attempts to avoid local milk price floors through devices involving interstate sales of milk.

17. Since the Food Fair Stores vertical integration by acquiring the Hernig Milk Company in 1957, there has been a clear trend in the lower Delaware Valley wholesale market toward vertical integration and consolidation. Chain stores have acquired milk companies, milk companies have opened stores, milk companies have used facilities in other states to serve regional or national chains of stores, farmer cooperatives have acquired milk companies, milk companies have acquired other milk companies and chain stores have constructed their own milk plants.

18. When Food Fair acquired Hernig Milk Company and then worked out its arrangement with Abbott's in New Jersey, first Pennbrook and then Sealtest lost the Food Fair business.

19. When Frankford-Unity Stores acquired Quaker Dairy in 1963 or 1964, Pennbrook lost that wholesale business. When Southland Corporation acquired Harbison's Dairy, Sealtest lost that

wholesale business. When A & P built its own milk plant, Sylvan Seal "practically lost" its milk producing business.

20. The data compiled in Exhibit D-27 is correct and Sealtest's percentage of the relevant milk market (total) was 18.13% in 1963 and 17.25% in 1965.

21. In view of the continuing changes in the market and the loss by Sealtest of Food Fair, 7–11 Stores, Molish, Martel and others, there is no basis to conclude that Sealtest dominates the wholesale market.

22. Changes in transportation and refrigeration of milk have led to less dependence on local milk supplies and milk is sold and distributed on a multi-state basis.

23. It is not unusual for a large chain of supermarkets to buy all of its milk and dairy products from one milk company.

24. When the supermarket chains in the lower Delaware Valley, such as Penn Fruit, faced the competition from Food Fair's acquisition of Hernig Milk Company in the late 1950's they recognized the advantages of acquiring milk in states not subject to the price and other regulations which existed in Pennsylvania.

*State Regulation*

25. Price floors and methods of distribution vary between southeastern Pennsylvania, southern New Jersey and Delaware either because of variations in the scheme of state milk regulation or the absence of state regulation, as in Delaware.

26. Because of such variations both Pennbrook and Sealtest have been able to charge customers in different states different prices.

27. During the period from 1960 to date the wholesale prices in Pennsylvania have been the highest of the three states and Delaware the lowest.

28. At time of trial a half-gallon of milk was selling out-of-the-store in Pennsylvania at 57 cents and in New Jersey at 45 cents—a price difference of over 26%.

29. In addition, New Jersey had a platform price which permitted a milk company to sell at a lower price at its plant in New Jersey than it could sell in Pennsylvania.

30. Since 1957 Sealtest has operated a milk plant in Camden, New Jersey, from which Sealtest distributes milk to the three-state Delaware Valley area.

31. Sealtest's Camden plant was designed and built to handle distributors' vehicles in an economic fashion.

32. Since 1958 some of Sealtest's Pennsylvania distributors have been picking up milk at its Camden platform.

33. These Pennsylvania distributors purchased milk at the New Jersey OMI distributor (or subdealer) price, which was lower than the Pennsylvania price.

34. The OMI order (Exhibit D–22) established quantity pricing for the distributors—the greater the quantity purchased, the lower the per unit price.

35. Also, under the OMI order the distributor was granted a hauling allowance which varied with the distance it transported the milk.

36. To meet the competition from Pennbrook and others, in August 1961 Sealtest began to sell milk at its Camden platform to Penn Fruit.

37. Under the OMI order Sealtest charged Penn Fruit 18¾ cents per quart less a hauling allowance of ¾ cents per quart, or a net price of 18 cents per quart.

38. Pennsylvania did not have a platform price comparable to the price in New Jersey—the Pennsylvania price established by PMCC was 24 cents per quart.

39. In 1960 and 1961 milk companies, including Pennbrook and Sealtest, believed that the Pennsylvania wholesale prices were too high.

40. These milk companies supported price relief to the chain stores in Pennsylvania in the form of quantity discounts and platform pricing.

41. Quantity discounts were adopted by PMCC in 1964, but they did not provide sufficient price relief for the chain stores.

42. In 1962 Pennbrook petitioned PMCC to establish a platform price in Pennsylvania equal to that in New Jersey, because the PMC order prevented Pennbrook from selling milk at the New Jersey price.

43. Platform pricing for chain stores permits the chains to transport the milk from the milk company's plant to their stores at a lower cost.

44. However, PMCC did not permit platform pricing to chain stores until 1967.

45. In the meantime, New Jersey recognized that chains of supermarkets have the economic resources to go into the milk business themselves and, therefore, granted milk dealer's licenses to the chains and permitted milk companies to lease processing facilities to the chains.

46. Pennbrook has a plant in Pennsylvania and none in New Jersey.

47. Sealtest has plants in both Pennsylvania and New Jersey.

### Meeting Competition

48. By the late 1950's the supermarket chains in the Delaware Valley were looking for methods by which they could improve their milk margins, because Food Fair had acquired Hernig Milk Company and was thereby obtaining milk at less than PMCC prices.

49. In June and July 1960 Penn Fruit and Martin Century met to work out a joint venture between the two companies by which Martin Century would supply all Penn Fruit's milk and ice cream requirements. Martin Century offered Penn Fruit a cost saving or price reduction of 26% to 28%.

50. After Penn Fruit took the option on the Bucks County milk plant, Penn Fruit negotiated with Martin Century for most of 1961.

51. Sealtest was told by Penn Fruit that if Penn Fruit accepted the Martin Century proposal, Sealtest would lose all of the Penn Fruit business.

52. In 1960 Penn Fruit was Sealtest's largest wholesale customer in the Delaware Valley.

53. Sealtest was the sole supplier of milk and ice cream to 27 of Penn Fruit's 45 Pennsylvania stores, and served ice cream in the remaining 18 stores.

54. Pennbrook supplied Penn Fruit with only milk in the remaining 18 stores in Pennsylvania.

55. Although both Sealtest and Pennbrook paid advertising to Penn Fruit prior to 1960, as early as 1958 Pennbrook began to offer increased rebates to Penn Fruit in exchange for some of Sealtest's business with Penn Fruit; Pennbrook offered to increase its advertising payments to Penn Fruit in exchange for five Penn Fruit stores with an annual milk volume of $110,-000.00.

56. Faced with the competition of the Food Fair-Hernig arrangement, in 1960–1961 Penn Fruit sought to improve its margins on milk.

57. Penn Fruit contacted Sealtest in August 1960, and advised Sealtest that it was pursuing ways to improve its purchase of dairy products.

58. Penn Fruit told Sealtest that Penn Fruit had taken an option on a milk plant in Doylestown, and that Martin Century Farms was going to manage it and process milk for the Penn Fruit stores. Pennbrook was also asked to consider processing milk for Penn Fruit on a joint venture basis.

59. Pennbrook also was told that Penn Fruit was considering having its own processing facilities or entering into a joint venture with another dairy, and that it had a milk plant under option in Doylestown.

60. Pennbrook contacted its milk consultant to formulate an offer to Penn Fruit.

61. On August 17, 1960 Pennbrook and its consultant reviewed the basic

cost figures, and tentatively concluded that it could offer milk to Penn Fruit at its platform for 16 cents per quart or deliver it to the Penn Fruit stores for 19 cents per quart.

62. Pennbrook concluded that Penn Fruit could deliver the milk more economically than Pennbrook because the Penn Fruit drivers were not paid commissions, which the Pennbrook drivers received.

63. A delivery cost savings of more than 3 cents per quart would be realized.

64. In any event, whether milk was sold at the platform for 16 cents or delivered to the stores for 19 cents, a very good profit would be realized by Pennbrook.

65. Thereafter, there were a series of meetings among the Pennbrook personnel and between Pennbrook and Penn Fruit to discuss "how we might facilitate a joint operation".

66. By the end of August 1960 Pennbrook produced a format for a joint venture with Penn Fruit.

67. On August 30, 1960 Pennbrook met with Penn Fruit and the next day forwarded its operating statement to Penn Fruit.

68. By September 15, 1960 Pennbrook's consultant produced his written analysis, in which he discussed certain methods of furnishing milk to Penn Fruit, including the incorporation of Pennbrook and the sale of stock to Penn Fruit.

69. Again, both Pennbrook and the consultant recognized that Pennbrook could provide Penn Fruit with milk at the platform for 16 cents per quart or deliver to the stores for 19 cents per quart.

70. Later in September Penn Fruit requested Pennbrook to submit a written proposal, and Pennbrook and its consultant began its preparation, with the guidance of David M. Gwinn.

71. Pennbrook met with Penn Fruit in October 1960 and submitted its written proposal dated October 14, 1960.

72. In its written proposal Pennbrook offered to deliver milk to all the stores of Penn Fruit for 19½ cents per quart, a price substantially less than the PMCC minimum price of 23 to 25 cents.

73. Pennbrook's offer, which was equivalent to a platform price of 16½ cents, was predicated on certain cost savings which Pennbrook felt justified the lower price.

74. Penn Fruit advised Sealtest that it had received a written proposal from Pennbrook. Sealtest made some attempts to determine the details of Pennbrook's offer, and Penn Fruit described some of its negotiations with Pennbrook.

75. Although Sealtest was unable to determine the exact price of Pennbrook's offer, Sealtest was able to learn from Penn Fruit that Pennbrook's price was somewhat lower than the price which Sealtest proposed and Penn Fruit accepted.

76. Pennbrook's proposal to Penn Fruit was also predicated on obtaining the business which Sealtest had with Penn Fruit in the Delaware Valley.

77. Sealtest understood from Penn Fruit that, if Pennbrook's proposal were accepted by Penn Fruit, Sealtest would lose its Delaware Valley area business with Penn Fruit.

78. In an effort to retain its business with Penn Fruit, Sealtest proposed by letter of April 10, 1961 to deliver milk to Penn Fruit at Sealtest's Camden plant.

79. Sealtest's proposal was not predicated in any way on its obtaining any milk business from Pennbrook or on obtaining additional business in other products or other states; rather, Sealtest made its proposal to retain the milk business it already had with Penn Fruit in the three-state area.

80. Sealtest's proposal was accepted in the spring of 1961, and Penn Fruit began to pick up milk in Camden in August 1961 and to transport the milk in Penn Fruit trucks to Pennsylvania for resale in its stores.

81. Pennbrook's proposal to Penn Fruit of October 14, 1960 was still open and under consideration by Penn Fruit when Penn Fruit accepted Sealtest's proposal.

82. Moreover, when Sealtest began to deliver milk to Penn Fruit in Camden in August 1961, Pennbrook was still negotiating with Penn Fruit.

83. Pennbrook's managing partner and its general manager both admitted that Pennbrook offered to sell its facilities to Penn Fruit, and offered to operate the plant for Penn Fruit under a management contract for a term of years.

84. This separate offer of Pennbrook was discussed between Penn Fruit and Pennbrook during 1961 and into 1962.

85. Penn Fruit advised Sealtest of this separate Pennbrook offer in the fall of 1961, and Sealtest believed that it was an additional threat to its business with Penn Fruit.

86. Also, Penn Fruit received an offer from Country Maid Dairy in the summer or fall of 1961.

87. Sealtest began to deliver to Penn Fruit at Camden because it believed that such an arrangement was the only practical and legal method by which it could retain the milk business it then had with Penn Fruit.

88. The prices which Sealtest charged Penn Fruit in Camden were the OMI distributor prices.

89. Sealtest's price to Penn Fruit was 18 cents per quart at Sealtest's platform in Camden; Pennbrook's price to Penn Fruit was 19½ cents per quart delivered, or 16½ cents per quart at Pennbrook's Philadelphia platform.

90. Sealtest's proposal was designed to meet the competition of Pennbrook and other milk companies for Penn Fruit's Pennsylvania stores.

91. The prices which Sealtest charged Penn Fruit in Camden were available to other wholesale customers of Sealtest.

92. Two other customers of Sealtest—Molish and Martel—also bought milk at Sealtest's Camden platform. The prices charged Molish and Martel were somewhat higher than the prices to Penn Fruit because (1) those customers purchased fewer products and the costs varied, and (2) the OMI quantity pricing did not permit Sealtest to charge prices as law as the Penn Fruit prices.

93. At a later date Sealtest lost both Molish and Martel to Martin Century and other competitors.

94. During a period between 1963 and 1967 Sealtest delivered milk to Penn Fruit, and during a part of that period to Molish and Martel, at Sealtest's distribution depot in Claymont, Delaware because the New Jersey Supreme Court held that these wholesale customers were not entitled to distributor prices in New Jersey.

95. The leased Claymont depot was similar to Sealtest's depots in Washington and Baltimore.

96. In 1966 OMI in New Jersey issued Penn Fruit a milk dealer's license and Sealtest began to process milk for Penn Fruit in Camden under a lease of facilities arrangement.

97. Sealtest began processing milk for Acme at Camden in July 1966, which milk Acme delivers to its stores throughout the Delaware Valley.

98. Prior to July 1966 Sealtest sold some products to Acme, and Sealtest entered into the processing arrangement to retain this business because Acme was going to build its own processing plant.

99. Pennbrook recently contacted Penn Fruit and discussed Pennbrook's

attack on the constitutionality of the Pennsylvania Milk Control Law to see if Pennbrook can obtain the Penn Fruit business.

100. Pennbrook has also discussed with Penn Fruit obtaining Penn Fruit's business if some part of the wholesale market in Pennsylvania can be removed from price control.

### Cost Justification

101. It costs a milk company less to deliver milk to its wholesale customers at the platform of the milk company's plant or distribution depot than to deliver it to the store of the customer.

102. When Penn Fruit began purchasing milk from Sealtest in Camden, Penn Fruit employees began transporting the milk in Penn Fruit trucks to its stores, whereas previously Sealtest employees had been transporting the milk in Sealtest trucks.

103. Penn Fruit was and is able to perform the delivery function at a lower cost than either Pennbrook or Sealtest.

104. Before Sealtest submitted its proposal to Penn Fruit it analyzed the cost savings involved to determine that the prices proposed were justified by cost savings.

105. All Sealtest's wholesale customers, whether store customers or others, are served by the same routes and vehicles and are part of the same pool of costs.

106. Therefore, in comparing costs all Sealtest's wholesale customers must be treated as a unit.

107. In its cost study (Exhibit D–23) Sealtest (1) computed its costs under its "full service" system of delivering to stores with its own trucks and drivers and performing in-store services of rotating product, etc. and (2) its costs under a "limited service" system of turning over the milk to the customer at the platform of Sealtest's plant.

108. The computation revealed the following savings, expressed as a percentage of the sales dollar or selling price:

| | |
|---|---|
| delivery expense | 14.4% |
| selling expense | 5.0 |
| general and administrative expense | 2.4 |
| | 21.8% |

109. In addition, there was a lower material cost in New Jersey in 1961 which increased the savings another 4.4%.

110. All costs which were attributable to serving Penn Fruit at the platform in Camden were included in the computation.

111. Then Sealtest compared the difference in the cost computation with the difference in PMCC and OMI minimum selling prices.

112. The difference in costs, expressed as a percentage of the selling price, was 26.2%.

113. The difference in minimum selling prices between Pennsylvania and New Jersey was 21.8%.

114. Sealtest charged Penn Fruit the OMI minimum prices (21.8% below the PMCC minimum), which were 4.4% more than the full savings which were cost justified.

115. Sealtest's cost study is a reasonable and proper method of comparing costs and justifying prices.

116. Since April 1961 Sealtest has continually checked the various cost factors and has determined that its prices to Penn Fruit have remained justified by cost savings.

117. At trial Sealtest produced formal exhibits (Exhibits D–28 and D–28A) of its continuing cost checks.

118. Two typical months in the milk industry are April and October.

119. The exhibits (Exhibits D–28 and D–28A) cover typical and representative industry periods of activity.

120. Nothing occurred in the intervals between the periods covered by the

exhibits which would alter the costs or prices shown thereon.

121. Sealtest's continuing cost checks (Exhibits D–28 and D–28A) are a reasonable and proper method of comparing costs and justifying prices.

122. Sealtest's exhibits D–28 and D–28A show that its prices to Penn Fruit from 1962 through 1967 were cost justified by from more than one cent to more than two cents per quart.

123. Sealtest's prices in Camden to Molish and Martel were higher than its prices to Penn Fruit, but so were Sealtest's costs to those customers.

124. Sealtest was not selling to either Molish or Martel below costs.

125. Sealtest's prices to Penn Fruit were cost justified, and made only due allowance for differences in the cost of manufacture, sale and delivery.

### Other Factors

126. Although some of the testimony suggests that the quality of Sealtest's product, packaging, national advertising, and customer in-store services were factors in Penn Fruit's switch, in 1961, from Pennbrook to Sealtest, it is beyond doubt that the major factor that led to the switch was the low price under which Sealtest was able to sell its milk to Penn Fruit at the Camden platform.

### DISCUSSION

Penn Fruit, in 1961, was able to obtain milk for its Pennsylvania stores at prices far below those permitted under the Pennsylvania Milk Control Act for milk delivered into-the-store (in Pennsylvania), by sending its trucks to Sealtest's platform located in Camden, New Jersey. See, Pennsylvania Milk Control Act, Pa.Stat.Ann. Tit. 31, § 700j–101 ff. At the same time, Sealtest continued to sell milk into-the-store in Pennsylvania, charging the minimum floor prices permitted by the Pennsylvania Milk Control Commission (hereafter PMCC) under the Milk Control Act—prices substantially higher than those offered to Penn Fruit. Undoubtedly, the lower New Jersey price available at Sealtest's Camden platform was the single major factor in Penn Fruit's dropping Pennbrook as a supplier. Plaintiffs argue that the above arrangement is a "classic" violation of the Robinson-Patman Act, particularly because of the "deep pocket" strength Sealtest has in the lower Delaware Valley milk market, citing Utah Pie Co. v. Continental Baking, 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed. 2d 406 (1967). (See also, Bowman, "Restraint of Trade by the Supreme Court: The Utah Pie Case," 77 Yale L.J. 70 (1967) and F.T.C. v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed. 2d 1385 (1960), where primary line violations because of discriminatory geographic price variations are discussed.) Plaintiffs' description of the present case as a "classic" violation of the Robinson-Patman Act is inappropriate in light of the unusual market factors at work in the lower Delaware Valley milk market.

Sealtest sold its milk at the Camden platform to Penn Fruit under a platform delivery price permitted by the New Jersey Milk Control Law. The Pennsylvania Milk Control Act did not provide for platform pricing. As a consequence, Pennsylvania price floors were higher as they did not provide for a lower price when the purchasing store transports the milk from the processor's platform.

In addition, Sealtest was able to offer Penn Fruit an exceptionally low price at the Camden platform because Sealtest charged Penn Fruit the prices that the New Jersey Office of Milk Industries allowed to be charged to a milk "subdealer"—usually a middleman between the milk processor and the store. In 1963 the New Jersey Supreme Court held that Penn Fruit did not qualify as a "subdealer". The New Jersey Supreme Court did note, however, that the "legality" of the 1961 subdealer price category employed by Sealtest was "an arguable question", thus negativing any inference that Sealtest was attempting to "engage in a flagrantly-illegal effort to frustrate and circumvent the [New Jersey] dealer-store price minimums." National Dairy Products Corp. v. Hoffman, 40 N.J. 475,

489, 193 A.2d 125 (1963). As a result of this 1963 decision, Sealtest entered into a new arrangement with Penn Fruit whereby the milk processed in Camden was trucked through Philadelphia and into Sealtest's leased depot in Claymont, Delaware. Penn Fruit sent its tractors to Claymont where they were hitched to the milk trailers which were then hauled by Penn Fruit back into Philadelphia for delivery into the Penn Fruit stores.

But for the unusual market factors at work in the lower Delaware Valley milk market, Sealtest might be hard pressed to justify the odd pricing practices forced upon them by variations in (or absence of—as in Delaware) milk price regulation imposed by the states. This market is far different in its mechanics than the open price market in cases such as the *Utah Pie* case, supra. The tri-state milk market relevant to this case reflects a price rigidity not found in the sale of other foodstuffs. This price rigidity, imposed on the milk market by state price regulation, has generated tremendous momentum between buyers and sellers to enter into non-price arrangements designed to avoid artificially high price floors. Vertical integration is rampant (see Finding of Fact #17). In addition, dairies, including the plaintiff Pennbrook, made "advertising allowances" plus loans of capital and refrigeration equipment. All of these mechanisms reflect one obvious purpose—they are intended to avoid the impact of the price floors by offering purchasers cost savings on advertising or equipment to compensate for the lack of cost savings normally available through lower prices. Vertical integration of facilities is a typical example. Through vertical integration, the milk processor and the milk wholesaler merge into one operation and thus avoid the necessity of a "sale" between processor and the wholesaling chain store. With such vertical integration the state imposed wholesale price floor on wholesale sales is avoided.

Interstate sales of milk serve a similar function in the lower Delaware Valley area. For example, in the present case,

Sealtest was able to avoid the higher Pennsylvania price floors and take advantage of the lower New Jersey platform rates by selling its milk to Penn Fruit at the Camden platform. Pennbrook described this market phenomenon in its "Petition For Appeal" pending in the state courts, wherein Pennbrook is challenging the constitutionality of the Pennsylvania Milk Control Act. Pennbrook stated, in its "Petition For Appeal" (Defendant's Exhibit D–2, at p. 11):

> That Pennbrook is a local company which competes with the large national dairies for customers in the Philadelphia area but because of the Pennsylvania Milk Control Law, it cannot compete with them on an equal basis because they can avoid the impact of the Law by out-of-state sales and therefore Pennbrook should not be classified with them for price-fixing purposes. Since commencing business about twenty-five years ago and until 1955 Pennbrook's business was based on sales to chain stores. Because the Milk Control Law prevented Pennbrook from taking effective steps to hold its chain store customers, Pennbrook has lost all these customers which formerly represented an annual volume of about $1,500,000. In 1955, Pennbrook lost twenty stores operated by Baltimore Markets and in 1957 Pennbrook lost thirty Food Fair stores. These customers represented a combined annual volume of sales of some $700,000. In 1961, as a result of the Sealtest-Penn Fruit transaction, Pennbrook lost eighteen supermarket customers which for the three prior years had purchased from it in excess of $750,000 of milk annually.

Pennbrook's plight is shared by other dairies in the lower Delaware Valley area. In Sylvan Seal Milk, Inc. v. Milk Control Comm. of Pa., 264 F.Supp. 1001 (E.D.Pa. 1967), 270 F.Supp. 117 (E.D.Pa.1967), the three judge court convened for testing the constitutionality of the Pa. Milk Control Law, concluded that while the law was constitutional the plaintiff, Sylvan Seal, was " * * * suffering immedi-

ate and irreparable harm as a result of the Commission's minimum into-the-store price controls." 264 F.Supp. at 1005, Finding of Fact #23. Cf., Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934). The *Sylvan Seal* opinions lucidly outline the burgeoning trends of vertical integration and interstate sales geared to avoid the artifically high price floors imposed under the Pennsylvania Milk Control Law.

It is because of these unique market conditions that Sealtest has easily sustained its burden of demonstrating its "meeting competition" and "cost justification" defenses. F.T.C. v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). Pennbrook itself posed a continuing threat to Sealtest in its attempts to vertically integrate with Penn Fruit. Even under its Camden-Claymont delivery arrangements, Sealtest lost customers to competitors. In addition, Sealtest's 1961 Camden platform price offer to Penn Fruit was a good faith response to the individual competitive situation posed by Pennbrook. F.T.C. v. A. E. Staley Mfg. Co., 324 U.S. 746, 65 S.Ct. 971, 89 L.Ed. 1338 (1945). See, Frey, "The Evidentiary Burden on Affirmative Defenses Under Section 2(f) of the Robinson-Patman Act: *Automatic Canteen* Revisited," 36 Geo.Wash.L.Rev. 347 (1967). Sealtest's cost justification adequately demonstrated the true economies of selling its milk in large bulk quantities at the Camden platform to Penn Fruit. Sealtest's cost justification study was based upon a comparison of its costs to serve Penn Fruit at Camden and Claymont and its costs incurred in serving its Pennsylvania retail store customers as a group. (Findings of Fact #104 to 107). Such a cost study met the requirements set forth in United States v. Borden Co., 370 U.S. 460, 82 S.Ct. 1309, 8 L.Ed.2d 627 (1962), as the class of Sealtest's Pennsylvania retail customers as a group reflects the "uniformity and selfsameness" of the defendant's cost of doing business with customers in that group. American Motors Corp. v. F.T.C., 384 F.

2d 247, 254 (6th Cir. 1967), cert. denied, 390 U.S. 1012, 88 S.Ct. 1260, 20 L.Ed.2d 164, 4/8/68.

Several matters remain. Sealtest has raised, as a defense, the contention that its conformity to Pennsylvania milk price floors, imposed under the Pennsylvania Milk Control Law, affords an immunity to any alleged violation of the Robinson-Patman Act. This is a novel proposition under the Robinson-Patman Act. Sealtest's position is as follows: (1) both Pennsylvania and New Jersey have the legal right to impose minimum wholesale milk prices (see, Nebbia v. People of State of New York, supra); (2) the Supreme Court, in Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), has held (in a Sherman Act context) that conformity to state price floors is an activity imposed by a state on sellers through legislation and is "state activity" beyond the reach of the antitrust laws, as the antitrust laws were designed to limit only "individual activity" (see also, United States v. Erie Co. Malt Bev. Ass'n, 264 F.2d 673 (3rd Cir. 1959)); (3) Sealtest's prices to Penn Fruit at the Camden platform were in attempted conformity with New Jersey milk control price floors, while Sealtest's sales to its other Pennsylvania customers conformed to the Pennsylvania, state imposed, price floors; (4) Sealtest's prices to Penn Fruit at the Claymont, Delaware depot were not subject to any state milk regulation, although Sealtest's sales to its other Pennsylvania customers, into-the-store in Pennsylvania, conformed to the Pennsylvania Milk Control Law. Sealtest argues, from its position outlined above, that although Penn Fruit obtained a price difference, no Robinson-Patman violation could occur as Sealtest always conformed to Pennsylvania price floors in the prices charged its other Pennsylvania customers on into-the-store sales.

Sealtest has called the Court's attention to the Federal Trade Commission's Advisory Opinion No. 154, 32 F.R. 20716 (12–22–67), where the F.T.C. applied the Parker v. Brown guidelines to a dairy

distributor who conformed to state imposed price regulations. This F.T.C. Opinion states, in relevant part:

> The Commission advised that it was of the opinion that the distributor would not be subject to a charge of violating any of the laws it administers because of its compliance with the lawful orders of the State as to the minimum resale prices of dairy products. In the Commission's view, it is well settled that the antitrust laws have application to the actions of individuals, partnerships, and corporations and not to the activities of a State. While a State may not authorize individuals to perform acts which violate the antitrust laws nor declare that such action is lawful, it may, in the exercise of its sovereign power, itself conduct such regulation of business activities *within its borders* as its own legislature shall properly deem necessary in the public interest. So long as the resulting regulation is a State as opposed to individual activity, those subject to the regulation would not be subject to a charge of violating the antitrust laws by reason of their compliance with the State's orders. [Emphasis supplied.]

■ Both the Parker v. Brown decision and the F.T.C. Opinion stand for the proposition that the antitrust laws are not designed to prohibit a state from exercising a valid state price regulating power "within its borders". Once a state sets a price floor on sales made within the geographic boundaries of the state, a seller has *no option but to conform* to this "state activity" on the sales he makes "within its borders". But Sealtest's arrangements with Penn Fruit, with the sales being made at Camden, New Jersey and Claymont, Delaware were beyond the range of Pennsylvania's price regulating power. By selling its milk to Penn Fruit, a Pennsylvania store, in New Jersey or in Delaware, Sealtest had an *additional option*—it could either sell its milk into-the-store to Pennsylvania customers and conform to Pennsylvania regulation, or it could offer to some (or all) of its Pennsylvania customers interstate arrangements whereby the Pennsylvania customer could buy his milk out-of-state at a price lower than that permitted under Pennsylvania price floors. In other words, Sealtest through its interstate sales was in a position either to make its sales conform to the inflated Pennsylvania into-the-store prices or to offer lower price arrangements in New Jersey and Delaware. Sealtest had, in effect, an option open to it, by means of its interstate sales, of charging either higher in-state, into-the-store, prices to some of its Pennsylvania wholesale customers, while extending to others the lower, out-of-state prices. Such a pricing option is beyond the broad immunities permitted by Parker v. Brown. Sealtest was able to skirt the Pennsylvania price floors through its New Jersey and Delaware sales, thus offering Penn Fruit and others lower prices, while continuing to charge its remaining Pennsylvania customers the higher, Pennsylvania regulated, prices imposed by the Pennsylvania Milk Control Law. Sealtest cannot claim an immunity over its higher priced sales made into-the-store in Pennsylvania arguing that these prices were mandated by the Pennsylvania Milk Control Law as Sealtest could have offered lower prices in New Jersey or Delaware, if the economics of such an arrangement were attractive enough to Sealtest. Once Sealtest charged different prices for its milk to its Pennsylvania wholesale customers, depending on whether the sale was into-the-store in Pennsylvania, or was made at the Camden platform or Claymont depot, then the Robinson-Patman Act became operative. Under such circumstances, Sealtest then had the burden to demonstrate an adequate defense, such as cost justification, to plaintiffs' prima facie case, as they have successfully done in the case at hand.

■■ Pennbrook has raised several evidentiary matters. Pennbrook argues, initially, that the testimony of John Bowers is inadmissible as hearsay. Bowers was Secretary and House Counsel of Penn Fruit in 1961 and testified to matters that transpired at Operating Com-

mittee meetings of the Board of Directors. No minutes were kept of these meetings. Oral reports were made to the Committee concerning the various offers milk companies were making to Penn Fruit. Pennbrook maintains that Bowers' testimony as to these oral reports are inadmissible hearsay. The argument is without merit. Pennsylvania permits parol evidence to show what happened at corporate meetings when the corporate minutes are silent on the matter. Schmitt v. Burns, Fleming & Co., 67 Pa. Super. 449, 452 (1917). Further, as Professor McCormack observes, oral business reports " * * * do satisfy the other guaranty of trustworthiness which comes from being part of the system on which the operation of the business depends." McCormack, Evidence (1954) 599. Bowers identified Exhibits D-3 and D-19 as documents considered by Penn Fruit's Operating Committee in making their decision as to Penn Fruit's milk supplier in 1961. These were introduced not to prove the truth of the facts therein but rather as a document considered by the Committee in reaching a corporate decision and as such are not hearsay. See, 1 Henry Pennsylvania Evidence (1953) § 441, and Wagner v. Wagner, 158 Pa.Super. 93, 97, 43 A.2d 912 (1945).

■ One final point. Sealtest demonstrated a plausible defense of *in pari delicto*. Such a defense has been completely negatived by the Supreme Court in Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (6/10/68), where the Supreme Court states:

> We therefore hold that the doctrine of *in pari delicto*, within its complex scope, contents, and effects, is not to be recognized as a defense to an antitrust action.

Inasmuch as plaintiffs have not sustained their burden of proving a violation of the Robinson-Patman Act, they are not entitled to recovery of any damages, and the extensive issues raised during the course of the trial and argument relating to damages will not be discussed.

## Conclusions of Law

1. Within the scope of the Robinson-Patman Act, 15 U.S.C. § 13(a), the relevant geographic market is the lower Delaware Valley area, which consists of southeastern Pennsylvania, southern New Jersey and Delaware.

2. Within the scope of the Robinson-Patman Act, the relevant functional market is the wholesale milk market and includes sales by milk companies to food service and vending customers, as well as to stores.

3. The prices charged by Sealtest and paid by Penn Fruit did not injure competition, or create any possibility of injury to competition, at any business level in the Delaware Valley.

4. The prices charged by Sealtest and paid by Penn Fruit do not tend to create any monopoly in the market.

5. Throughout the relevant time period there has been keen competition among milk companies for wholesale customers.

6. Pennbrook has failed to prove that Sealtest violated the Robinson-Patman Act.

■ 7. The Commerce Clause of the Federal Constitution prohibits a state from regulating milk transactions in another state or the minimum prices of such transactions. Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935); Highland Farms Dairy, Inc. v. Agnew, 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835 (1937).

8. The Pennsylvania Milk Control Law and the regulations and orders of PMCC prevent Pennbrook from adequately competing with milk companies which have plants outside of Pennsylvania.

9. Discrimination, if any, against Pennbrook is the result of PMCC's inability to regulate transactions and prices outside of Pennsylvania, or PMCC's failure to provide price relief in Pennsylvania.

10. The prices charged by Sealtest and paid by Penn Fruit were established in good faith to meet competition within

the scope of the Robinson-Patman Act, including the lower price of Pennbrook.

11. The prices charged by Sealtest and paid by Penn Fruit make only due allowance for differences in cost of manufacture, sale and delivery of milk to Penn Fruit within the scope of the Robinson-Patman Act.

12. Pennbrook suffered no damages compensable under the Robinson-Patman Act stemming from Sealtest's sales to Penn Fruit.

13. Under the facts and law, judgment will be entered for the defendant National Dairy Products Corporation ("Sealtest").